UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

LENORE VICTORIAN,            )
                                   )
           Plaintiff,         )
                                   )
        v.                 )          No. 4:15-CV-00667-AGF
                                   )
WELLS FARGO HOME MORTGAGE,   )
et al.                            )
                                   )
          Defendants.     )

## MEMORANDUM AND ORDER

This matter is before the Court on the joint motion (ECF No. 85) for summary judgment filed by Defendants Wells Fargo Home Mortgage ("Wells Fargo") and Deutsche Bank National Trust Company ("Deutsche Bank"). Plaintiff's claims against these Defendants (the only remaining claims in this case) arise out of the foreclosure of Plaintiff's real property by Wells Fargo. On May 2, 2017, the Court gave the parties notice that it believed one of Plaintiff's claims may be subject to summary judgment on a ground not raised by Defendants, and allowed the parties an opportunity to submit supplemental briefing on this issue. Upon careful review of the parties' initial and supplemental briefs, and for the reasons set forth below, the Court will grant Defendants' motion.

## BACKGROUND

For purposes of this summary judgment motion, the record establishes the following. On October 27, 2006, Plaintiff purchased real property located at 471 Olde

Court Road, St. Charles, Missouri 63303. The same day, she executed two adjustable rate notes, secured by deeds of trust on the property, in favor of MILA, Inc., DBA Mortgage and Investment and Lending Associates, Inc. ("MILA"). The first was in the amount of $408,862 ("First Mortgage"), and the second was in the amount of $102,216 ("Second Mortgage"). Wells Fargo acquired the First Mortgage in December 2006, and Chase Bank, a former Defendant in this case, at some point acquired the Second Mortgage.[1]

Initially, Plaintiff's monthly payment on the First Mortgage was $2,720.17, but on March 24, 2010, Wells Fargo entered into a loan modification agreement with Plaintiff, which lowered Plaintiff's monthly payment to $1,889.65. On September 10, 2010, Plaintiff's personal liability for any future deficiency judgment on her mortgages, in the event of foreclosure, was discharged as part of a Chapter 7 bankruptcy proceeding.

By March 2012, Plaintiff was more than 60 days delinquent on the First Mortgage and attempted to obtain another modification of her payment terms under the federal Home Affordable Modification Program ("HAMP"). Wells Fargo is a participating servicer under a HAMP Service Participation Agreement with the federal government.

As explained in *Topchian v. JPMorgan Chase Bank, N.A.*, 760 F.3d 843 (8th Cir. 2014):

> HAMP modifications proceed in two steps. Step One involves the mortgage servicer of an eligible homeowner offering the homeowner a Trial Period Plan (TPP) agreement. A TPP agreement allows the

---

[1] The record does not indicate the date on which Chase acquired the Second Mortgage.

homeowner to make modified mortgage payments for a specified term. If all conditions of the TPP agreement are satisfied, the homeowner then proceeds to Step Two, at which point he is offered a permanent loan modification agreement that outlines the terms of the final modification.

760 F.3d 843, 846 (8th Cir. 2014).

Plaintiff submitted a HAMP application dated June 11, 2012, in which she left blank the fields titled "First Mortgage Payment" and "Second Mortgage Payment."  In her affidavit submitted in response to Defendants' motion, Plaintiff states that she left these fields blank because she was told to do this by a representative of Wells Fargo via telephone when she called to ask how to fill out the form.  Plaintiff states that when she spoke to Wells Fargo about completing the HAMP application at this time, she informed a Wells Fargo representative of her Second Mortgage.

Plaintiff later submitted updated HAMP applications, dated August 21, 2012 and September 24, 2012,[2] in which she entered "$2,714" in the field for "First Mortgage Principal & Interest Payment" but entered "0" in the field for "Second Mortgage Principal & Interest Payment."  In her affidavit, Plaintiff states that she listed her Second Mortgage payment as "0" because "the NACA[3] representative told us . . . that Wells Fargo's system would automatically populate this field on the application when they ran a title report as part of the application process."  ECF No. 88-4 at 3.

---

[2]    The September 2012 application included more information than the August application.

[3]    As alleged in her complaint, Plaintiff worked with the Neighborhood Assistance Corporation of America ("NACA") Home Save Program in her attempt to obtain a HAMP modification.  ECF No. 24 at 11.

In Plaintiff's signed HAMP applications, she certified that all of the information in the applications was truthful; that she authorized the servicer, Wells Fargo, to investigate her eligibility for modification and the accuracy of the statements in her applications; and that she understood that Wells Fargo was not obligated to offer her assistance based solely on the representations in her applications.

On October 11, 2012, Wells Fargo sent Plaintiff a packet of documents stating that she was approved to enter into a Trial Period Plan ("TPP") agreement under HAMP. The TPP was comprised of several documents. First, it included an approval letter, which stated that Plaintiff was required to make three trial period payments instead of her normal monthly mortgage payments, during the trial period of November 1, 2012 to January 1, 2013, and that Plaintiff was to accept the TPP by calling Wells Fargo or by sending her first trial period payment within 14 days of the date of the letter. The letter further stated: "After all trial period payments are timely made and you have submitted all the required documents, your mortgage may be permanently modified." ECF No. 86-2 at 44.

Also included in the TPP was a "Frequently Asked Questions" document, which stated: "The trial period is temporary, and your existing loan and loan requirements remain in effect and unchanged during the trial period." *Id.* at 46. This document further stated: "Once you make all of your trial period payments on time, we will send you a modification agreement detailing the terms of the modified loan." *Id.* at 47.

The next document, titled "Important Program Info," stated: "We will not proceed to the foreclosure sale during the trial period, provided you are complying with the terms of the Trial Period Plan." But the document further stated:

> Any pending foreclosure action or proceeding that has been suspended may be resumed if you are notified in writing that you failed to comply with the terms of the Trial Period Plan or do not qualify for a permanent modification.
>
> * * *
>
> The servicer's acceptance and posting of your new payment during the trial period will not be deemed a waiver of the acceleration of your loan (or foreclosure actions) and related activities, and shall not constitute a cure of your default under your loan unless such payments are sufficient to completely cure your entire default under your loan.

*Id.* at 48.

Finally, the TPP included a second letter with additional information, stating: "Before your loan can be modified, you will need to successfully complete the trial period plan by making all trial payments on the dates they're due and meeting all other requirements. . . . **If you don't comply with trial period terms**, we will send you a Non-Approval notice. Examples of not meeting the terms of the [TPP] include not making your payments on time, or not sending us the required documents." *Id.* at 42.

Notably, although the HAMP guidelines provide that servicers "may include, as necessary, conditional language in HAMP offers and modification agreements indicating that the HAMP will not be implemented unless the servicer receives an acceptable title endorsement, or similar title insurance product, or subordination agreements from other existing lien holders, as necessary, to ensure that the modified mortgage loan retains its

first lien position and is fully enforceable," ECF No. 24-3 at 16, Plaintiff's TPP did not contain such language.

As required by the TPP, Plaintiff called Wells Fargo within 14 days to accept the TPP and also made her first trial period payment.

On or about November 27, 2012, Wells Fargo ran a title report on Plaintiff's property as part of their standard HAMP review process. The title report indicated liens on Plaintiff's property, including federal and state tax liens and the Second Mortgage. The parties dispute whether Wells Fargo knew about the Second Mortgage before November 27, 2012. As discussed above, Plaintiff contends that she informed a Wells Fargo representative about the Second Mortgage earlier, when filling out her HAMP application.

Wells Fargo shortly thereafter instructed Plaintiff that it required a subordination agreement from the second lien-holder (Chase).[4] In phone calls in November and December of 2012, Plaintiff informed Wells Fargo that Chase would not agree to subordinate the Second Mortgage. Plaintiff asserts that, more specifically, she informed Wells Fargo that Chase would not agree to subordinate the Second Mortgage at Plaintiff's request and that Chase required Wells Fargo to call Chase directly to request a subordination agreement.

---

[4] The record does not indicate the precise date on which Wells Fargo first instructed Plaintiff that it required a subordination agreement from Chase, but it is undisputed that Wells Fargo did so, and that by December 2012, Plaintiff had attempted (unsuccessfully) to obtain such an agreement.

Wells Fargo asserts that Chase's agreement to resubordinate its loan after any loan modification was necessary to avoid Wells Fargo's relinquishing its senior lien position, and that its insistence on subordination was in accordance with the HAMP guidelines for servicers. In particular, Wells Fargo points to the HAMP guidelines, which state that "HAMP does not require extinguishment of subordinate lien instruments as a condition of modification. However, servicers must follow investor guidance to ensure first lien priority." ECF No. 24-2 at 60. The guidelines further state:

> For all mortgage loans that are modified under HAMP, the servicer will follow investor guidance to ensure that the modified mortgage loan retains its first lien position and is fully enforceable. The servicer must work with the borrower to obtain approvals, including subordination agreements, if required by investor guidance. Servicers should extend the TPP as necessary to accommodate delays in obtaining approvals, but they are not required to extend the TPP beyond two months, resulting in a total five-month TPP.

*Id.* at 112.

On December 27, 2012, after Plaintiff had made two payments under the TPP, but before the expiration of the TPP, Wells Fargo notified Plaintiff that "she did not meet the requirements of HAMP because there [were] additional liens on [her] property." ECF No. 24 at 12.

Plaintiff ultimately made all three required payments under the TPP. She also continued to submit, and Wells Fargo continued to review, additional documentary materials in support of her request for HAMP relief. On April 10, 2013, a Wells Fargo representative responded by letter to an inquiry about Plaintiff's HAMP application from the office of United States Senator Claire McCaskill. The representative referenced

previous communications with the senator's office and stated: "As of the date of this letter, the following title issues need to be resolved: State of Missouri Department of Revenue lien. Federal Internal Revenue (IRS) lien." ECF No. 88-6 at 1. In a later letter to Senator McCaskill's office dated June 13, 2013, the same Wells Fargo representative indicated that on May 29, 2013, Wells Fargo received an updated title for the property showing that the state and federal tax liens had been removed, but that as of the date of this letter, the Second Mortgage lien was still on the title, and that Wells Fargo "must either receive a subordination agreement from the second lien holder, or receive proof that the second lien has been released" before moving forward with a review for HAMP modification. ECF No. 88-5 at 2-3.

Sometime in June 2013, Plaintiff called Chase to discuss subordination, but a Chase representative (identified in Plaintiff's first amended complaint as "Adrian Mitchell") informed her that it was not required to, and would not, sign a subordination agreement. Wells Fargo's Vice President of Loan Documentation, Jacqueline Luhmann, attests by affidavit that, sometime in June 2013, Wells Fargo called Chase to try to obtain a subordination agreement on Plaintiff's behalf, but that Chase refused to enter a subordination agreement unless the past-due amount on the Second Mortgage was paid in full. Plaintiff disputes this fact by asserting in her affidavit that, "[w]hen [she] spoke to Adrian Mitchell, he told [her] that he had not been contacted by Wells Fargo regarding the subordination agreement." ECF No. 88-4 at 4. However, Plaintiff does not assert the particular date on which she spoke to Mr. Mitchell.

On September 4, 2013, Wells Fargo sent Plaintiff notice that the total due to cure the default on her First Mortgage and bring the loan current was $57,089.67. Because Plaintiff failed to pay her past-due balance on the First Mortgage, Wells Fargo scheduled the foreclosure of Plaintiff's property. The foreclosure was first scheduled for February 2014, but was thereafter delayed while Wells Fargo reviewed additional documentary material that Plaintiff continued to submit. Each time Wells Fargo received and reviewed additional documents submitted by Plaintiff, Wells Fargo determined that Plaintiff still did not qualify for relief under HAMP. Wells Fargo sent Plaintiff a notice on April 30, 2014, updating the total due to cure the default on the First Mortgage and bring the loan current, to $75,698.60.

Plaintiff alleges that in June 2014, she repeatedly asked Chase to sign a subordination agreement with respect to the Second Mortgage, but Chase refused to sign a subordination agreement unless and until Plaintiff entered into a new payment plan with respect to the Second Mortgage. Plaintiff also alleges in her amended complaint that, in phone calls in July and August 2014, a Wells Fargo representative told Plaintiff that "the only impediment to her receiving a permanent modification under HAMP were the other liens on her Home and that she would be offered a permanent modification under HAMP if she removed all liens from her Home." ECF No. 24 at 18.

Wells Fargo issued a final decision denying Plaintiff's request for permanent loan modification in August 2014. Chase never provided Plaintiff with a subordination agreement to give to Wells Fargo.

Chase released its Second Mortgage lien on October 29, 2014, and Wells Fargo proceeded with foreclosure on Plaintiff's property. On December 15, 2014, Deutsche Bank purchased the property at a foreclosure sale, for $450,000.

Plaintiff filed suit in state court on February 28, 2015, and Defendants removed the case to this Court on April 22, 2015. The only remaining claims in Plaintiff's amended complaint are: breach of contract, including breach of the implied covenant of good faith and fair dealing, against Wells Fargo for its failure to offer Plaintiff a permanent loan modification (Count II); fraudulent misrepresentation against Wells Fargo for falsely representing in the TPP that Plaintiff would receive a permanent loan modification agreement, and for falsely representing in phone calls in July and August 2014 that the only impediment to receiving a permanent modification under HAMP was the other liens on Plaintiff's home (Count III); violation of the Missouri Merchandising Practices Act ("MMPA") against Wells Fargo for certain conduct and actions taken throughout the loan modification negotiations (Count VI); and a request for declaratory judgment declaring that Plaintiff is the "fee simple owner" of the property and that the foreclosure sale of the property by Wells Fargo to Deutsche Bank is "void and of no legal effect" (Count VII). ECF No. 24 at 34-35.

## ARGUMENTS OF THE PARTIES

With respect to breach of contract (Count II), Wells Fargo argues that the TPP was not an enforceable contract for a permanent loan modification, but merely a temporary forbearance agreement, in which Wells Fargo agreed not to foreclose on the property while Wells Fargo determined Plaintiff's eligibility for a permanent loan modification,

and with which Wells Fargo complied.  In any event, Wells Fargo argues that it did not

breach any term of the contract, or the implied covenant of good faith and fair dealing, by

declining to offer Plaintiff a permanent loan modification both because Plaintiff's

application contained a misrepresentation with respect to the Second Mortgage and

because Plaintiff failed to comply with the TPP's requirement to send Wells Fargo a

document it required—the subordination agreement from Chase.

Next, Wells Fargo argues that summary judgment is warranted on Plaintiff's

fraudulent misrepresentation claim (Count III) because the "representations" relied upon

by Plaintiff—the TPP and the phone calls in July and August 2014—did not include any

false statement.  Wells Fargo contends that the TPP, read as a whole, made clear that

making the three TPP payments, alone, did not guarantee a permanent loan modification

and that Wells Fargo could ultimately determine that Plaintiff did not qualify for

permanent loan modification.  With respect to the July and August 2014 phone calls,

Wells Fargo argues that if a representation was made that "other liens" impeded

Plaintiff's eligibility for a permanent loan modification, that representation was true.

For similar reasons, Wells Fargo argues that its conduct was not unfair or

deceptive under the MMPA (Count VI) as a matter of law.  Wells Fargo also contends

that Plaintiff cannot establish an ascertainable loss, an element of an MMPA claim,

because any money she paid as TPP trial period payments would have been owed in any

event under her First Mortgage.

As indicated above, the Court invited the parties to brief whether the MMPA claim

should be dismissed on a ground not raised by Defendants, namely, on the ground that

Wells Fargo's allegedly unlawful acts were not taken "in connection with the sale . . . of any merchandise in trade or commerce," as required by the MMPA. In its supplemental briefs, Wells Fargo argues that the MMPA claim should also be dismissed for this reason. Specifically, Wells Fargo argues that all but two of its allegedly unlawful acts, which are listed in paragraph 139 of Plaintiff's first amended complaint, were taken in connection with the parties' loan modification negotiations, and the Missouri Supreme Court has held that such acts do not satisfy the "in connection with the sale" element of an MMPA claim.

The remaining two acts are listed in subparagraphs (n) and (o) of paragraph 139:

(n) [Wells Fargo] [e]ngaged in behavior designed to receive additional payments (including the [TPP] payments) and benefits (including the removal of other liens) from Plaintiff and then ultimately sell Plaintiff's home at a foreclosure sale.

o. [Wells Fargo] [m]isstat[ed] the amount necessary to bring Plaintiff's First Mortgage Current by including charges that were not authorized or that Wells Fargo was required to waive as a result of Plaintiff's entitlement to a permanent loan modification under HAMP; and

ECF No. 24 at 30. Wells Fargo concedes that these two acts were arguably taken in connection with the original sale of the loan, which the Missouri Supreme Court has held falls within the scope of the MMPA. But Wells Fargo argues that the acts nevertheless fail to give rise to a viable MMPA claim because, as discussed above, they were not unfair or deceptive and did not result in an ascertainable loss.

Finally, Defendants argue that they are entitled to summary judgment on Count VII's request for declaratory judgment because Plaintiff cannot show that she has superior title to the property.

In response, Plaintiff argues that a "genuine issue of material fact" exists with respect to her breach of contract claim, as to (1) whether the TPP was an offer for a permanent loan modification, (2) whether she accepted that offer by sending the required paperwork and making all TPP payments in a timely manner, and (3) whether Wells Fargo breached the terms of the contract and the covenant of good faith and fair dealing by refusing to permanently modify Plaintiff's loan. Plaintiff argues that Wells Fargo breached the implied covenant of good faith and fair dealing by insisting on a subordination agreement from Chase when Wells Fargo was aware of the Second Mortgage before approving Plaintiff for the TPP.

Plaintiff also argues that there is a genuine issue of fact with respect to her fraudulent misrepresentation claim, as to whether the TPP was a materially false representation.[5] Plaintiff appears to argue that because the HAMP guidelines provide that servicers like Wells Fargo should evaluate borrowers to see if they meet the underwriting and eligibility criteria for HAMP before offering borrowers a TPP, the offering of the TPP was a representation that Plaintiff qualified for a permanent modification, and was false because she did not so qualify.

Plaintiff likewise argues that genuine issues of material fact exist regarding "whether Wells Fargo violated the MMPA by deliberately misrepresenting what Plaintiff needed to do in order to obtain a permanent modification and whether Plaintiff was

---

[5] Plaintiff does not address the alleged July and August 2014 phone calls in her response to Defendants' motion for summary judgment on the fraudulent misrepresentation claim.

damaged by being tricked by Defendant into making payments on a loan after her personal liability for the loan was discharged in bankruptcy and Plaintiff had no obligation or incentive to make payments towards the loan after the discharge." ECF No. 88 at 12.

In her supplemental briefs, Plaintiff "concedes that to the extent allegations contained in Count VI [the MMPA claim] relate to loan modification misrepresentations, . . . those actions do not satisfy the 'in connection with the sale' element of an MMPA claim." ECF No. 105 at 1. However, Plaintiff argues that subparagraphs (n) and (o) of paragraph 139, described above, relate to Wells Fargo's enforcement of the original loan terms, which is actionable under the MMPA.

Finally, Plaintiff argues that she is not seeking to quiet title via Count VII but merely seeking a declaratory judgment determining the rights of the parties with respect to the property at issue.

## DISCUSSION

"Summary judgment is appropriate when, viewing the facts in the light most favorable to the non-movant, there are no genuine issues of material fact and the movant is entitled to judgment as a matter of law." *Metro. Prop. & Cas. Ins. Co. v. Calvin*, 802 F.3d 933, 937 (8th Cir. 2015) (citation omitted). In opposing summary judgment, the non-movant may not "simply point to allegations" in the pleadings, *Howard v. Columbia Pub. Sch. Dist.*, 363 F.3d 797, 800 (8th Cir. 2004), or "rest on the hope of discrediting the movant's evidence at trial," *Citizens Loan & Sav. Co. v. Weiser*, 621 F.2d 911, 913 (8th Cir. 1980). Rather, the non-movant "must identify and provide evidence of specific facts

creating a triable controversy." *Howard*, 363 F.3d at 800 (citation omitted). "'Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no genuine issue for trial.'" *Torgerson v. City of Rochester*, 643 F.3d 1031, 1042 (8th Cir. 2011) (en banc) (quoting *Ricci v. DeStefano*, 557 U.S. 557, 586 (2009)).

## Breach of Contract

Under Missouri law, which the parties agree governs here, a "breach of contract action includes the following essential elements: (1) the existence and terms of a contract; (2) that plaintiff performed or tendered performance pursuant to the contract; (3) breach of the contract by the defendant; and (4) damages suffered by the plaintiff." *Topchian v. JPMorgan Chase Bank, N.A.*, 760 F.3d 843, 850 (8th Cir. 2014) (citing *Keveney v. Mo. Military Acad.,* 304 S.W.3d 98, 104 (Mo. 2010)). "A valid contract contains the essential elements of offer, acceptance, and bargained for consideration." *Id.* (citations omitted).

Plaintiff's breach of contract claim fails as a matter of law because the TPP, at most, was a conditional offer to proceed to Step Two of HAMP and permanently modify Plaintiff's First Mortgage *if* she made all trial period payments and sent Wells Fargo any required documentation. Read as a whole,[6] the TPP makes clear that Plaintiff was not guaranteed a permanent loan modification, and that Wells Fargo could ultimately

---

[6] The parties agree that the various documents comprising the TPP must be read together. *See Johnson ex rel. Johnson v. JF Enterprises, LLC*, 400 S.W.3d 763, 768 (Mo. 2013) ("[C]ontemporaneously signed documents relating to one subject matter or transaction are construed together.")

determine that Plaintiff did not qualify for a permanent loan modification if Plaintiff did not satisfy Wells Fargo's requirements.

Accepting as true Plaintiff's allegation that Wells Fargo knew about the Second Mortgage before offering her the TPP, Wells Fargo perhaps could have made the particular conditions of the TPP more explicit. For example, Wells Fargo could have added the conditional language permitted (but not required) under the HAMP guidelines, to indicate that the HAMP would not be implemented unless Wells Fargo received subordination agreements from other existing lien holders. But the Court cannot say that failing to do so prohibited Wells Fargo from imposing that condition, particularly where, as here, Wells Fargo included more general conditional language that Plaintiff would not qualify for a permanent modification if she did not send Wells Fargo required documentation. Because Plaintiff failed to satisfy this condition by failing to obtain and send Wells Fargo the subordination agreement from Chase, a contract for a permanent loan modification never formed. *See Olson v. Wells Fargo Bank, N.A.*, No. CIV. 13-780 DWF/JJK, 2015 WL 4661984, at *3, *12-13 (D. Minn. Aug. 5, 2015) (holding that the plaintiff's breach of contract claim on a similarly worded TPP failed as a matter of law because "the record demonstrates that Plaintiffs failed to provide proof of clean title or a subordination agreement before Wells Fargo closed its file and therefore did not perform the required conditions for a loan modification").

Plaintiff's failure to satisfy a condition of the TPP also distinguishes this case from the cases she cites in her brief. *See Topchian*, 760 F.3d at 846-47, 851 (finding that a plaintiff plausibly stated a breach of contract claim for a bank's failure to permanently

modify his loan, where he alleged sufficient facts, accepted as true at the pleading stage, that he complied with all terms of the TPP and actually received a permanent loan modification agreement from the bank, even if the agreement was not signed by the bank, because the bank waived the signing condition); *Young v. Wells Fargo Bank, N.A.*, 717 F.3d 224, 234-35 (1st Cir. 2013) (holding that where it was undisputed that the plaintiff satisfied all conditions for a permanent loan modification, and in fact was tendered a permanent loan modification but after the time anticipated by the plaintiff, the plaintiff stated a breach of contract claim for the defendant's failure to timely offer a permanent modification agreement); *Wigod v. Wells Fargo Bank, N.A.*, 673 F.3d 547, 563 (7th Cir. 2012) ("Once Wells Fargo signed the TPP Agreement and returned it to [the plaintiff], an objectively reasonable person would construe it as an offer to provide a permanent modification agreement *if she fulfilled its conditions*.") (emphasis added).

Because the Court finds that no valid contract for a permanent loan modification formed, Plaintiff's claim for breach of the implied covenant of good faith and fair dealing also fails as a matter of law. *See Olson v. Curators of Univ. of Mo.*, 381 S.W.3d 406, 410 (Mo. Ct. App. 2012) ("The existence of a contract is . . . an integral part of a claim of breach of the covenant of good faith and fair dealing."); *Reitz v. Nationstar Mortg., LLC*, 954 F. Supp. 2d 870, 891-92 (E.D. Mo. 2013) (holding that where the plaintiff "failed to adequately plead that the TPP Agreement was a valid contract that entitled her to a permanent loan modification," her claim for breach of the covenant of good faith and fair dealing necessarily failed to state a claim).

**Fraudulent Misrepresentation**

A claim for fraudulent misrepresentation under Missouri law requires proof of the following elements: "(1) a representation; (2) its falsity; (3) its materiality; (4) the speaker's knowledge of its falsity or ignorance of its truth; (5) the speaker's intent that it should be acted on by the person in the manner reasonably contemplated; (6) the hearer's ignorance of the falsity of the representation; (7) the hearer's reliance on the representation being true; (8) the hearer's right to rely thereon; and (9) the hearer's consequent and proximately caused injury." *Topchian*, 760 F.3d at 853 (citing *Renaissance Leasing, LLC v. Vermeer Mfg. Co.,* 322 S.W.3d 112, 131-32 (Mo. 2010)).

Plaintiff's claim that the TPP falsely represented that she qualified for a permanent loan modification fails as a matter of law. As discussed above, the TPP represented that Plaintiff may qualify for a permanent loan modification if she satisfied the conditions of the TPP. Plaintiff has not offered evidence that such representation was false or that Wells Fargo knew it was false at the time. Even accepting as true that Wells Fargo knew about the Second Mortgage before offering Plaintiff the TPP, its offering of the TPP did not represent that Plaintiff was guaranteed a permanent loan modification. Rather, the TPP made clear that Wells Fargo could require additional documentation, that failure to submit those documentations could result in denial of a loan modification, and that foreclosure could proceed if Plaintiff failed to comply with the TPP or failed to qualify for a permanent modification. These representations were true.

Furthermore, although Plaintiff appears to have abandoned her other basis for fraudulent misrepresentation—Wells Fargo's alleged representations by phone in July

and August 2014 that the only impediment to Plaintiff's receipt of a permanent loan modification was the other liens on her home—those representations, if made, were also true. The record establishes that one of the "other liens," namely, the Second Mortgage, which Chase refused to subordinate at the time, was in fact an impediment to Plaintiff's ability to obtain a permanent loan modification.

## MMPA (Count VI)

The MMPA makes unlawful "[t]he act, use or employment by any person of any deception, fraud, false pretense, false promise, misrepresentation, unfair practice or the concealment, suppression, or omission of any material fact in connection with the sale . . . of any merchandise in trade or commerce." Mo. Rev. Stat. § 407.020.1. "[A]ny person who 'suffers an ascertainable loss of money or property' as the result of an unlawful practice may file a civil lawsuit to recover actual and punitive damages, as well as attorney fees, from any person who has engaged in a method, act or practice declared unlawful by section 407.020." *Huch v. Charter Commc'ns, Inc*., 290 S.W.3d 721, 725 (Mo. 2009) (citing Mo. Rev. Stat. § 407.025.1).

Most of Wells Fargo's allegedly unlawful actions were not taken "in connection with the sale . . . of any merchandise in trade or commerce." In *Watson v. Wells Fargo Home Mortgage, Inc*., 438 S.W.3d 404 (Mo. 2014), involving a dispute as to whether a plaintiff was entitled to a permanent loan modification before Wells Fargo foreclosed on her property, the Missouri Supreme Court considered which of Wells Fargo's actions were taken "in connection with" the original loan transaction, so as to bring them within

the scope of the MMPA. The *Watson* court noted that the plaintiff in that case had

alleged that Wells Fargo violated the MMPA by

> (1) negotiating the loan modification in bad faith; (2) using an unequal bargaining power to obtain [the plaintiff's] signature on the modification agreement; (3) falsely stating she had rescinded the modification agreement after accepting it to justify proceeding with the foreclosure sale; (4) foreclosing on the property despite promising to postpone foreclosure proceedings during the modification discussions; and (5) failing to provide notice of the foreclosure sale in violation of section 443.325, RSMo 2000.

*Id.* at 406-07. The court divided these claims into two categories, "those relating to the

loan modification negotiations [1-3] and those relating to the alleged wrongful

foreclosure [4-5]." *Id.* at 407. The Missouri Supreme Court held that, with respect to the

latter, "[i]n the context of an alleged wrongful foreclosure, the plaintiff was able to state a

claim under the MMPA against the foreclosing entity, regardless of whether that entity

was a party when the loan was first procured, because a party's rights to collect a loan is

part of that sale and, therefore, 'in connection with' the loan." *Id.* at 407-08 (citation

omitted); *see also Wivell v. Wells Fargo Bank, N.A.*, 773 F.3d 887, 899 (8th Cir. 2014)

("Wells Fargo's act of foreclosing on the [plaintiffs'] property despite promising them

that applying for a loan modification would suspend a foreclosure sale was 'in connection

with' the sale of the [the plaintiffs'] loan.") (relying on *Watson*, 438 S.W.3d at 407-08).

But with respect to Wells Fargo's former actions, during loan modification

negotiations, the *Watson* court held that those actions "were not 'in connection with' the

sale of the loan" because "[i]n engaging in loan modification negotiations, Wells Fargo

was not enforcing the terms of the loan but rather contemplating creating a new agreement."[7] *Watson*, 438 S.W.3d at 408.

Almost all of the allegedly unlawful actions listed in Plaintiff's complaint were actions taken with respect to loan modification negotiations, rather than with respect to enforcement of the original loan terms. *See* ECF No. 24 ¶ 139. As the parties apparently agree, only Plaintiff's allegations in subparagraphs (n) and (o) appear to relate to enforcement of the original loan terms in that they allude to Wells Fargo's actions in stating the amount necessary to bring Plaintiff's First Mortgage current and in foreclosing on Plaintiff's property.

Plaintiff alleges that Wells Fargo's actions in (n) and (o) were unlawful in light of the TPP. But the TPP made clear that the existing loan requirements remained "in effect and unchanged during the trial period," that acceptance of TPP payments would not be deemed a waiver of the acceleration of Plaintiff's loan or foreclosure actions, and that,

---

[7]     Although Plaintiff did not raise this issue, the Court notes that *Watson* left open the question, raised for the first time on appeal in that case, of whether loan modification negotiations may be made "in connection with" a separate "sale" of a loan modification, *see Watson*, 438 S.W.3d at 407 n.2. However, at least one court within the Eighth Circuit has since considered the question and found that, although the offer of a loan modification may fall within the definition of a "sale" under the MMPA § 407.010, to state a claim under the MMPA, "the harmed consumer must have proceeded to 'purchase[] or lease[]' the merchandise offered.'" *Wivell v. Wells Fargo Bank, N.A.,* No. 6:12-CV-3457-DGK, 2015 WL 7259836, at *6 (W.D. Mo. Nov. 17, 2015) (citing *Jackson v. Charlie's Chevrolet, Inc.*, 664 S.W.2d 675, 677 (Mo. Ct. App. 1984) ("One who attempts to purchase, but who never receives the goods or services nor pays anything of value cannot be said to have suffered damage by reason of any unlawful practice.")). Therefore, a borrower who is denied a loan modification does not have an actionable MMPA claim arising "from the fruitless negotiations." *Id.* at *6-7. The Court agrees, and finds that to the extent Plaintiff's MMPA claim is based on Wells Fargo's actions with respect to loan modification negotiations, it fails as a matter of law.

although foreclosure would not take place during the trial period, foreclosure could proceed if Plaintiff was notified that she did not qualify for a permanent modification. Wells Fargo complied with these procedures by not foreclosing on Plaintiff's property during the trial period and only doing so after it notified her that she did not meet the requirements for a permanent modification. Although the scope of "unlawful" conduct under the MMPA is broader than the common law definition of fraud, *Ward v. W. Cty. Motor Co.*, 403 S.W.3d 82, 84 (Mo. 2013), the Court does not believe that it extends this far. *See Wivell v. Wells Fargo Bank, N.A.*, No. 6:12-CV-3457-DGK, 2015 WL 7259836, at *6 (W.D. Mo. Nov. 17, 2015) ("Wells Fargo did not commit an unfair or deceptive trade practice [under the MMPA] by sticking to those procedures [outlined in a deed of trust]"); *Chochorowski v. Home Depot U.S.A.*, 404 S.W.3d 220, 223 (Mo. 2013) (finding that a rental equipment seller's automatic inclusion of a damage waiver fee did not violate the MMPA as a matter of law in light of the seller's clear, written disclosure of the fee in the rental agreement). The Court will therefore grant Wells Fargo summary judgment on Count VI.

**Declaratory Judgment (Count VII)**

Because Plaintiff's substantive claims fail as a matter of law, Defendants are also entitled to summary judgment on Count VII's request for declaratory judgment. *See Hart v. Wells Fargo Home Mortg., Inc.*, No. 2:16-CV-04171-NKL, 2016 WL 5923429, at *5 (W.D. Mo. Oct. 11, 2016) (holding that inasmuch as the plaintiff's substantive claims failed to state a claim, the claim for declaratory judgment also had to be dismissed); *Anderson v. Wells Fargo Home Mortg.*, No. CV 14-5013 ADM/JSM, 2016 WL 755615,

at *9 (D. Minn. Feb. 25, 2016) ("[A] declaratory judgment is a remedy, not a cause of action.") (citations omitted).

## CONCLUSION

For the reasons set forth above,

**IT IS HEREBY ORDERED** that Defendants' motion for summary judgment is **GRANTED**. ECF No. 85.

All claims against all parties having been resolved, a separate Judgment shall accompany this Memorandum and Order

AUDREY G. FLEISSIG
UNITED STATES DISTRICT JUDGE

Dated this 12th day of June, 2017.